Gary E. Klein
(admitted *pro hac vice*)
klein@kkcllp.com
Shennan Kavanagh
(admitted *pro hac vice*)
kavanagh@kkcllp.com
Kevin Costello
(admitted *pro hac vice*)
costello@kkcllp.com
**Klein Kavanagh Costello, LLP**
85 Merrimac Street
Boston, MA 02114
Phone: (617) 357-5500

Gretchen Carpenter
(State Bar No. 180525)
gcarpenter@strangeandcarpenter.com
**Strange & Carpenter**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA  90025
Phone:  (310) 207-5055
Fax:  (310) 826-3210

Attorneys for Plaintiff Karen Stone

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAREN STONE,<br><br>On her own behalf and for all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>OCWEN FINANCIAL CORPORATION,<br>OCWEN LOAN SERVICING, LLC,<br>ALTISOURCE PORTFOLIO SOLUTIONS, S.A.,<br>ALTISOURCE SOLUTIONS, INC., and<br>WILLIAM ERBEY,<br><br>Defendants. | Case No. 2:15-CV-00302<br><br>**FIRST AMENDED COMPLAINT FOR: (1) FRAUDULENT CONCEALMENT (2) UNJUST ENRICHMENT; (3) BREACH OF LOAN CONTRACTS; (4) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; (5) DECLARATORY AND INJUNCTIVE RELIEF; (6) VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT; (7) VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW; AND (8) VIOLATION OF CALIFORNIA'S ROSENTHAL ACT**<br><br>**CLASS ACTION** |

i

## INTRODUCTION

1.     Karen Stone ("Plaintiff") brings this class action on behalf of herself and a nationwide class of similarly situated individuals ("the Class") as set forth below.  This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d).

2.     This case involves the actions of Defendants Ocwen Financial Corporation and Ocwen Loan Servicing, LLC (collectively "Ocwen"), its Executive Chairman, William Erbey, and related companies, affiliates, contractors (including the "Altisource" defendants) and agents.  Ocwen services residential mortgage loans.

3.     Defendants have engaged in a nationwide scheme of illegal, unfair, unlawful, and deceptive business practices that violate both federal and state law in the servicing of home-secured loan transactions and in the provision of certain related services, including debt collection and foreclosure services.  This scheme is carried out by means of a centrally controlled set of policies and practices and is implemented with form documents, form notices and uniform accounting mechanisms.

4.     Defendants have created business practices that allow them to profit from the misery of struggling homeowners and to siphon off money that the homeowners could use to cure their defaults.

5.     Ocwen has turned homeowner default into a profit center, so much so that it is routinely indifferent to circumstances in which its own mistakes and/or overcharges generate or exacerbate the default.

6.     Specifically, Defendants routinely seek to collect, and do collect late charges that are not due from homeowners under mortgages, deeds of trust and/or loan notes (collectively referred to herein as "Loan Contracts").

7.     The Ocwen Defendants routinely pay the Altisource Defendants marked-up fees to perform work on delinquent accounts including, without

FIRST AMENDED CLASS ACTION COMPLAINT

1  limitation, above market fees for insurance, inspection fees, appraisals, broker's

2  price opinions, title services, and auction services.  Ocwen then passes the

3  unreasonable marked up charges through to homeowners in violation of Loan

4  Contracts.

5          8.     Ocwen's overseas call centers are designed to frustrate customer

6  inquiries rather than to provide customers with meaningful information and

7  assistance.  Overseas employees do not have access to information present in

8  Ocwen's records and/or sufficient authority from Ocwen necessary to respond to or

9  resolve customer inquiries and problems.  It often takes many weeks or months for

10  homeowners to reach an Ocwen employee with information about and/or sufficient

11  authority to resolve servicing problems, during which time additional late fees and

12  default and delinquency charges typically arise.

13          9.     Ocwen's written correspondence to borrowers is likewise confusing

14  because they do not contain accurate information about defaults and amounts owed

15  and are routinely sent out late.

16        10.     Each of the actions complained of herein is undertaken by the

17  Defendants to generate illegal or improper revenue for one or more of them.  Such

18  actions are not undertaken on behalf of the mortgage holders for whom the

19  Defendants service loans.

20        11.     Through misapplication of loan payments or otherwise, Ocwen

21  routinely treats borrowers as in default on their loans even though the borrowers

22  have tendered timely and sufficient payments or have otherwise complied with

23  mortgage requirements or applicable law.

24        12.     The Defendants' practices are misleading, deceptive and/or unfair

25  under state law including under, without limitation, Florida's Deceptive and Unfair

26  Trade Practices Act (FDUTPA) (F.S. § 501.201, et seq.) and California Unfair

27  Competition Law, (Cal. Bus. and Prof. Code § 17200, et seq.)

28        13.     The practices described herein also violate contract law and the

FIRST AMENDED CLASS ACTION COMPLAINT

common law in each of the states in which the Defendants do business.

14.     In addition to damages, Ms. Stone and the Class seek injunctive and/or declaratory relief to prevent recurrence of the challenged conduct, and to assure uniform standards of future servicing of loans and equitable relief and damages for themselves and the Class generally, including restitution and disgorgement of funds obtained by Defendants in violation of state and federal law.

## SUBJECT MATTER JURISDICTION AND VENUE

15.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) because this class action is between citizens of different states; Ms. Stone is a citizen of a state different from the Defendant; a class action has been pled; the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and there are 100 or more members in the proposed classes.  28 U.S.C. § 1332(d).

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the unlawful practices complained of are carried out in this District; Ms. Stone lives in this District and each defendant regularly conducts business in this District.

17.     All conditions precedent to filing this Complaint have occurred, been performed, or been waived.

## PARTIES

18.     Plaintiff Karen Stone is a resident and citizen of California whose home-secured loan was serviced by Ocwen during the period covered by this action.

19.     Defendant Ocwen Financial Corporation is a publicly held Florida financial services company that is based in West Palm Beach, Florida.  Ocwen Financial regularly conducts business in this District.

20.     Defendant Ocwen Loan Servicing, LLC is a separately incorporated subsidiary of Ocwen Financial Corporation that is based in West Palm Beach,

FIRST AMENDED CLASS ACTION COMPLAINT

Florida.  Ocwen Loan Servicing regularly conducts business in this District.

21.     Ocwen maintains its principal call centers in India, the Philippines and Uruguay.  More than three quarters of its employees are located in one of those three countries.

22.     Defendants Ocwen Financial Corporation and Ocwen Loan Servicing, LLC are referred to collectively herein as "Ocwen."

23.     Defendant Altisource Solutions, Inc. ("Altisource") is a separately incorporated affiliate of Ocwen Financial Corporation with a principal place of business in Atlanta, Georgia.  Altisource Solutions regularly conducts business in this District.

24.     Ocwen is Altisource's largest customer, representing approximately 60% or more of Altisource's income.

25.     The Chairman of Altisource, William Erbey, is or has been the Executive Chairman of Ocwen.

26.     Altisource and Ocwen share employees.

27.     Altisource does business in its own name and also, in part, as "Hubzu" and/or "Hubzu.com."

28.     William Erbey is or has been the Executive Chairman of Ocwen and the Chairman of Altisource.

29.     Although Mr. Erbey has announced his intention to step down as Executive Chairman in the future, he participated in, directed and controlled the business practices raised in this Complaint, including, without limitation, the servicing policies and procedures implemented at Ocwen and the business strategy involved in spinning off Altisource so that it could charge above-market prices for default and delinquency-related services to Ocwen which could then be passed on to homeowners under the terms of Loan Contracts.

30.     Mr. Erbey regularly travels to California for business reasons, including on at least eight (8) occasions for business reasons associated with his

4

participation in the businesses of the other Defendants in this case.  He controls business practices that he knows or should know affect consumers in California and which are regulated by the state of California.  He manages employees and agents that do business in California, has interests in property in California and participates as an officer, director or principal in businesses that are licensed by the state of California.  Through these activities, directed toward California, Mr. Erbey has purposefully availed himself of the privilege of conducting business activities in California, and has profited from Defendants' acts.

**Agency/Joint Venture**

31.     At all times relevant to this Complaint, Defendants, both individually and collectively, together with affiliates not herein named, are and were agents or joint venturers of each of the other Defendants, and in doing the acts alleged herein were acting within the course and scope of such agency.  Each Defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced in, and/or authorized the wrongful acts of each co-Defendant, and/or retained the benefits of said wrongful acts.

**Aiding and Abetting**

32.     At all times relevant to this Complaint, Defendants, both individually and collectively, together with affiliates not herein named, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Ms. Stone and the Class, as alleged herein.  In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

FIRST AMENDED CLASS ACTION COMPLAINT

**Conspiracy**

33.     At all times relevant to this Complaint, Defendants, both individually and collectively, together with affiliates not herein named, knowingly and willfully conspired, engaged in a common enterprise, and engaged in a common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the conspiracy, common enterprise, and common course of conduct complained of was, *inter alia*, to financially benefit Defendants at the expense of Ms. Stone and the Class by engaging in fraudulent activities.  Defendants accomplished their conspiracy, common enterprise, and common course of conduct by misrepresenting and concealing material information regarding the servicing of loans, the relationships among them and by taking steps and making statements in furtherance of their wrongdoing as specified herein.  Each Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise and common course of conduct complained of herein, and was aware of its overall contribution to and furtherance thereof.  Defendants' wrongful acts include, *inter alia*, all of the acts that each of them is alleged to have committed in furtherance of the wrongful conduct complained of herein.

34.     Ms. Stone is informed and believes that the above-described conspiracy is ongoing, making it pointless for her to allege when the last overt act of the conspiracy occurred.

**GENERAL FACTS**

**Factual Background**

35.     Ocwen is a servicer of single-family mortgages, including the mortgages of Ms. Stone and the Class.  In the servicing industry, "single family mortgages" include mortgages on one to four-family dwelling units.

36.     A "servicer" is responsible for mortgage administration activities, known as servicing activities, which generally include collecting payments from mortgagors; applying payments made in an order called for by the relevant

FIRST AMENDED CLASS ACTION COMPLAINT

contractual agreements, to the mortgagor's indebtedness; distributing payments after allowable deductions, for amounts such as late charges, force-placed hazard insurance, and default and delinquency related advances to third parties; and pursuing collections from delinquent borrowers.

37. A servicer, such as Ocwen, that does not originate a mortgage loan may become the servicer by purchasing the "mortgage servicing rights" associated with the loan or by entering into a contract with the "master servicer" to act on its behalf as "subservicer." Such transfers can occur at various stages of repayment of the mortgage, including where the borrower is delinquent in payments.

38. Ocwen currently services more than $400 billion in "customer-care intensive, high risk single-family residential loans." *See* Ocwen website, *available at* http://www.ocwen.com/residential-servicing-why-choose-ocwen (last viewed on Jan. 13, 2015).

39. Many of the loans Ocwen acquired for servicing were originated as subprime loans between 2000 and 2010, often on predatory terms or at above-market interest rates.

40. Indeed, Ocwen is the nation's largest subprime mortgage servicer, managing more than one-quarter of outstanding subprime loans in the U.S. Horwitz, Jeff, *Mortgage Servicers Go to Extreme Lengths to Skirt New Regulations*, PBS NewsHour, Jul. 31, 2014, *available at* http://www.pbs.org/newshour/rundown/mortgage-servicers-create-multi-million-dollar-shell-companies-skirt-regulations/ (last viewed on January 13, 2015). For the 2013 fiscal year, Ocwen serviced 834,734 subprime loans with an unpaid principal balance of $146 billion. Ocwen Financial Corp., Amended Annual Report (Form 10-K/A), at 44 (Aug. 18, 2014). As of June 30, 2014, Ocwen claims to service 770,415 subprime loans with an unpaid principal balance of $131.8 billion. Ocwen Financial Corp., Quarterly Report (Form 10-Q), at 59 (Aug. 18, 2014).

FIRST AMENDED CLASS ACTION COMPLAINT

41.     Ocwen typically acquires the servicing rights to mortgage loans that were originated by a third party.  The applicable servicing transfer agreements provide that Ocwen acquires the unilateral right to make decisions about late fees and other default and delinquency charges that can be recovered under loan agreements being transferred to it for servicing.  Ocwen ultimately exercises full discretion to initiate processes that generate the late fees, force-placed hazard insurance charges and default and delinquency charges that it passes on to borrowers under Loan Contracts.

42.     Ocwen advances default and delinquency charges, where paid to third parties, and retains the right to recover the amounts advanced from borrowers.

43.     On obtaining servicing rights pursuant to servicing transfer agreements, Ocwen is assigned rights and is delegated obligations under the applicable Loan Contracts that govern its relationships with the Ms. Stone and the Class.  These assignments of rights and delegations of duties create privity between Ocwen and the borrowers with respect to the Loan Contracts it services within the meaning of the law.

44.      In its amended annual report filed with the SEC for 2013, Ocwen states that using the latest technology and scientific principles allows it to focus on "each individual borrower [to] create a 'market of one' that is focused on the unique needs of each borrower[]" resulting in Ocwen's ability to "increase borrower acceptance rates of loan modifications and other resolution alternatives while at the same time lowering re-default rates."  Ocwen Financial Corp., Amended Annual Report (Form 10-K/A), at 6 (Aug. 18, 2014).  Additionally, Ocwen maintains that it is able to keep families in their homes by using "new technology that incorporates consumer psychology to reduce [its] cost of servicing, improve customer service and enhance [its] ability to manage defaults."  *Id.* at 3.

45.     Contrary to its representations, when Ocwen takes over loans, it routinely breaches the Loan Contracts by, among other things, misapplying

FIRST AMENDED CLASS ACTION COMPLAINT

borrower payments, improperly charging late fees, overcharging for default and delinquency related services, failing to honor its obligation to maintain escrow accounts and charging for purported advances made by other servicers after acquiring servicing portfolios without adequate proof or basis for those charges.

46.    Ocwen's business model is to maximize revenues from loans in default without regard to whether it has a legal basis for the amounts it claims due.  Among other things it churns or mismanages delinquent accounts to exacerbate late fees, to profit from force-placed hazard insurance policies and to generate income generated by providing default and delinquency services.  Once Ocwen places a borrower in default, a cascading series of fees and charges are typically applied, making it increasingly difficult for a homeowner to return to a non-default status.

47.    In addition, because the amounts that it pays for third-party default, delinquency and foreclosure related services performed by its affiliate, Altisource, are priced above market rates and are passed through to homeowners under the terms of Loan Contracts, Ocwen's practices undermine homeowners' ability to resolve their defaults and lead to additional profit to one or more of the Defendants. Thus, when Ocwen collects these charges, it is not just "paying itself back" or recollecting advances; it is profiting by collection of excessive charges that are not "reasonable and appropriate" under the security instrument.

48.    The scheme implemented by Defendants is designed to defraud homeowners and to enrich Defendants.

49.    On December 22, 2014, Ocwen entered into a Consent Order with the New York State Department of Financial Services ("NY Department of Financial Services") pursuant to New York State Banking Law, Section 44, the third such consent order in the past four years.  *See In the Matter of Ocwen Financial Services,* Consent Order, *available* at http://www.dfs.ny.gov/about/ea/ea141222.pdf (last visited Jan. 13, 2015).  This most recent consent order is the end result of a regulatory investigation that revealed, among other things "deficiencies in Ocwen's

9

servicing platform and loss mitigation infrastructure, including (a) robo-signing, (b) inaccurate affidavits and failure to properly validate document execution processes, (c) missing documentation, (d) wrongful foreclosure, (e) failure to properly maintain books and records, and (f) initiation of foreclosure actions without proper legal standing." December 22, 2014 Consent Order at 3. In addition, investigations of internal portfolios that Ocwen has acquired "identified substantial deficiencies, weaknesses, and violations of laws and regulations relating to, among other things, foreclosure governance, implementation of modification programs, record keeping, required notifications, and the charging of unallowable fees." *Id.*

50. A Compliance Monitor appointed pursuant to one of the NY Department of Financial Services Consent Orders determined that "Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible." December 22, 2014 Consent Order at 6. "As a result, Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and maintains inaccurate records". *Id.*

51. The Consent Order also noted "widespread conflicts of interest" between Ocwen and related parties, such as Altisource.

52. The December 22, 2014 Consent Order with NY Department of Financial Services provides for $150 million to be paid by Ocwen to New York State, but the benefit of these payments does not extend beyond New York's borders. No homeowners' claims, in New York state or elsewhere, were released as part of the December 22, 2014 Consent Order.

### **Ocwen Has Engaged In A Pattern And Practice Of Assessing and Collecting Unlawful Late Charges In Breach of Contract And Other Relevant Law**

53. Ocwen is in the business of servicing loans initiated through other mortgage lenders. It frequently acquires servicing rights to risky mortgages, many

FIRST AMENDED CLASS ACTION COMPLAINT

of which were made on predatory terms.  Many of the mortgages serviced by Ocwen were in default when Ocwen acquired them for servicing.

54.   The Loan Contracts are contracts that uniformly provide that late charges are due when a monthly payment is late.

55.   The provisions of the Loan Contracts used in connection with residential home mortgages uniformly provide for a late fee when a "monthly payment" or "installment" is paid after its due date.

56.   After acceleration of the loan balance the entire loan balance is due. Thereafter, borrower payments in any amount are no longer considered "monthly" or "installment" payments as a matter of contract and applicable law.  There is no ongoing due date for partial payments of the loan.

57.   Absent a late monthly payment or installment, there is no legal or contractual basis under a mortgage, deed of trust or loan note for a servicer to impose a late charge.

58.   Ocwen has engaged in a pattern and practice of charging monthly late fees after acceleration of the loan balance in breach of contract and applicable state law.

59.   The revenue generated from late fees is included in Ocwen's servicing revenue.  Ocwen Financial Corp., 2013 Annual Report (Form 10-K/A), at F-12. ("We earn fees for servicing mortgage loans.  We collect servicing fees … from the borrowers' payments.  We also include late fees, prepayment penalties, float earnings and other ancillary fees in servicing revenue.  We recognize servicing fees as revenue when the fees are earned which is generally when the borrowers' payments are collected or when loans are modified or liquidated through the sale of the underlying real estate collateral or otherwise.")

60.   The illegal late charges are paid to Ocwen by borrowers when they enter into loan modifications, reinstate their mortgages, sell their homes or otherwise pay-off their loan balances.  *Id*.  *See also* Ocwen Financial Corp.,

11

Amended Annual Report (Form 10-K/A), at 49 (Aug. 18, 2014) ("The increase in modifications contributed to revenue growth because when we return a loan to performing status we generally recognize any deferred servicing fees and late fees on the loan.")

61.     In the alternative, Ocwen recovers the late charges from the proceeds of foreclosure sales of borrowers' homes.  *See* 2013 Annual Report, *supra*, at F-11 ("liquidated through the sale of the underlying real estate collateral").

62.     There are also tens of millions of dollars in unlawful Ocwen late fee assessments pending on borrowers' accounts.

63.     When paid, Ocwen, by contract with mortgage holders, retains the late charge payments and does not pass them through to mortgage holders.

64.     Ocwen claims that the late fees collected are a "significant component[] of the estimated future cash inflows for [Mortgage Servicing Rights]" in addition to "servicing fees… float earnings and other ancillary fees."  Ocwen Financial Corp., Quarterly Report (Form 10-Q), at 22 (Aug. 18, 2014).  As of the end of the second quarter in 2014, Ocwen reported it had already earned over $69 million in servicing revenue in 2014 from late charges alone.  *Id.* at 30, 58.

## **Ocwen, Altisource And Erbey Have Engaged In A Joint Scheme To Overcharge Homeowners For Foreclosure, Default And Delinquency Services That Ocwen Purchases From Altisource at Above-Market Prices**

65.     Throughout the relevant time period, Defendants conspired to increase their financial profits by overcharging homeowners for foreclosure and default-related services including, without limitation, insurance, inspection fees, appraisals, broker's price opinions, property maintenance fees, title searches and auction services (collectively "Foreclosure-Related Services").

66.     Erbey is or has been the Executive Chairman of Ocwen and the Chairman of Altisource.  In Ocwen's second quarter report of 2014 to the SEC it states that as of June 30, 2014, Erbey owned or controlled approximately 13% of

FIRST AMENDED CLASS ACTION COMPLAINT

Ocwen common stock and approximately 27% of Altisource common stock.  Erbey directly benefited from Altisource charging Ocwen above-market rates for Foreclosure-Related Services.

67.     The cost of the inflated fees charged by Altisource to Ocwen is passed on to homeowners.

68.     Based on information contained in the financial reports of its parent company, Altisource provides or procures various mortgage servicing and Foreclosure-Related Services for Ocwen including, but not limited to: force-placed hazard insurance, title searches, appraisals, default-related property inspections, insurance services, default management, and origination management.  Altisource Portfolio Solutions S.A., Quarterly Report (Form 10-Q), at 26 (July 29, 2014). Altisource reports that for the first six months of 2014, its revenue from Ocwen, its largest customer, for the mortgage services segment of their business relationship was $266.4 million, accounting for 67% of its revenue.  *See id.* at 8-9, 42.

69.     Ocwen customers alleged to be in default are routinely subjected to excessive charges for property valuations commonly known as Broker Price Opinions ("BPOs").  Although industry guidelines typically place the allowable limit for a BPO in the range of $80, in practice the actual cost of such a valuation is significantly lower.  Nevertheless, as a matter of policy or practice, Ocwen routinely charged its borrowers in default in excess of $100 for a BPO.  To make matters worse, Ocwen did not disclose this amount to borrowers.

70.     In fact, the Defendants have acknowledged the actual cost of a BPO is approximately $45.  In defending a lawsuit involving its sale of BPOs for a profit, the Defendants admitted that they engaged in a practice of buying BPOs at their actual cost of $45-$50, only to sell that same information to third-parties for up to $150.  *See Cartel Asset Management v. Ocwen Financial Corp.,* 249 Fed. Appx. 63, 72 n.9 (10th Cir. 2007) (recounting the testimony of William Erbey indicating that

FIRST AMENDED CLASS ACTION COMPLAINT

Ocwen typically paid an agent or broker approximately $45 to $50 to do the BPO and sell the reviewed BPO for approximately $150.)

71.     Over the last three years, the NY Department of Financial Services has issued multiple letters to Ocwen detailing its concerns in Ocwen's business relationships and dealings with its affiliated companies, Altisource and Hubzu.

72.     The NY Department of Financial Services issued a letter to Ocwen on August 4, 2014, questioning Ocwen's mortgage servicing practices in its provision of force-placed insurance transactions with Altisource.  The letter alleges that Ocwen's use of an unaffiliated insurance agent company acts as a means to funnel significant sums of money to Altisource for insurance commissions and certain fees requiring very little work without direct contact between Ocwen and Altisource. Moreover, the letter alleges that this business arrangement was approved by a three-member committee at Ocwen, which consisted of only one member of Ocwen's Board of Directors, Erbey, causing concerns of improper self-dealing among the Defendants.  The NY Department of Financial Services requested Ocwen provide information and documents explaining: the nature of Altisource's services provided to the unaffiliated insurance agent; Ocwen's policies and procedures permitting approval of business transactions solely through the three-member committee and reviewing approvals of transactions with related companies; and whether Ocwen considered the impact of Altisource's high fees for increasing insurance premiums on financially troubled homeowners.

73.     The NY Department of Financial Services also highlighted its concern with Erbey's conflicting role as a member of the Board and largest shareholder of both Ocwen and Altisource approving transactions between these related companies and whether the rates charged by related companies to Ocwen are actually at a fair-market rate.

74.     In its April 21, 2014 letter to Ocwen, the NY Department of Financial Services expressed concern with Ocwen's business dealings with Altisource's

14

business unit, Hubzu, which Ocwen uses as its principal online auction site for foreclosed homes.  The letter questions the 4.5% auction fee charged by Hubzu to Ocwen compared to Hubzu's auction fee as low as 1.5% for business in the open market.  These auction fees are passed on to the homeowners.  The letter states that due to the relationship among Ocwen, Altisource and Hubzu suggesting self-dealing, the marked up rates charged in the conflicted business transactions harm struggling homeowners who ultimately pay the inflated auction fees.

75.     Altisource similarly charges Ocwen fees for Foreclosure-Related Services that are either above the price it charges its other customers or are above prices for similar or identical services available on the open market.

76.     Loan Contracts used in connection with mortgage loans that Ocwen services uniformly limit charges for delinquency and foreclosure related services to those that are "reasonable," "necessary" or "reasonable and necessary."  Although the specific language of the limitation may differ from one form contract to the other, all forms used contain an applicable limitation that prevents a loan servicer from charging unreasonable or unnecessary amounts for force-placed hazard insurance, Foreclosure-Related Services and for other similar incidentals relevant to servicing delinquent mortgages.  Nowhere in the Loan Contracts is it disclosed to borrowers that the servicer may engage in self-dealing to mark up the actual cost of those services to make a profit.  Nevertheless, that is exactly what Ocwen does.

77.     Defendants together mark the services up beyond the price for similar services available in the open market and above the price Altisource charges other customers.

78.     The above-market Foreclosure-Related Service charges are repaid to Ocwen by borrowers when they enter into loan modifications, reinstate their mortgages, sell their homes, or otherwise pay-off their loan balances.

79.     In the alternative, Ocwen recovers the amounts it lays out from the proceeds of foreclosure sales of borrowers' homes.

FIRST AMENDED CLASS ACTION COMPLAINT

80.   There are also tens of millions of dollars in above-market Foreclosure-Related Service charges pending for payment on borrowers' accounts.

81.   Ocwen, by contract with mortgage holders, retains payments made for above-market Foreclosure-Related Service charges and does not pass them through to mortgage holders.

**Ocwen Advances Many of Its Schemes by Failing to Establish or by Mismanaging Escrow (Impound) Accounts Required as A Term of Mortgage Loan Contracts.**

82.   Some, but not all Loan Contracts require escrow accounts by their terms.  The required escrows typically require payments by the homeowner of the amounts necessary to cover hazard insurance and real estate taxes.  In California, these accounts are sometimes referred to as "impound" accounts.  This Complaint will refer to them as "escrow" accounts, thereby adopting the name typically used in the trade.

83.   Where required, proper accounting for escrow is mandated by the terms of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2605, 2609; and its implementing regulation (Regulation X), 24 C.F.R. § 3500.17.

84.   Ocwen routinely engages in the following misconduct with respect to required escrows:

a.   Failing to properly and timely pay hazard insurance and real estate taxes as due from escrows, thus generating late fees, creating defaults and leading to insurance cancellations, imposition of expensive force-placed hazard insurance policies, tax penalties and tax sales;

b.   Failing to properly account for amounts held in escrow;

c.   Failing to timely notify borrowers of changes in their escrow obligations, and

FIRST AMENDED CLASS ACTION COMPLAINT

d.      Using amounts that the borrower pays for principal and interest improperly to cover escrow amounts, thereby generating a default in loan payments.

85.     Ocwen's deliberate or negligent mismanagement of escrow accounts leads to borrower defaults, necessitating late charges and Foreclosure-Related Service charges from which one or more of the Defendants benefit.

## NAMED PLAINTIFF'S FACTS

### Karen Stone

86.     Karen Stone owns a home that is her primary residence, located at 6400 Crescent Park East, Apartment 416, Playa Vista, California 90094 ("Playa Vista Residence").

87.     Ms. Stone has been residing in the Playa Vista Residence for over 8 years.

88.     Ms. Stone purchased the Playa Vista Residence in 2006 with a loan ("Loan") she obtained from Countrywide Home Loans ("Countrywide").

89.     At the time, Countrywide was one of the largest subprime mortgage lenders in the country.  It was bought by Bank of America in 2008.

90.     The Loan had a principal balance of $250,350 and a 6.75% adjustable interest rate.  The monthly mortgage payment was in the amount of $1408.22.

91.     On information and belief, the Loan is owned by Freddie Mac.

92.     The Deed of Trust associated with the Loan contains the following provisions:

[9.]  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain

17

priority over this Security Instrument or to enforce laws or regulations); or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding…. Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

[14.]  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

[19.]  Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a

18

judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.

[22.] Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument…. The notice shall specify: (a) the default; (h) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by Ibis Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable

FIRST AMENDED CLASS ACTION COMPLAINT

attorneys' fees and costs of title evidence.

93.     The Note associated with the Loan contains the following provision:

[7.]  If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

94.     True and correct copies of the Deed of Trust and Note associated with Loan are attached as Exhibits A and B.

95.     In August 2011, Ms. Stone entered into a permanent loan modification with Bank of America (the "Modification"), modifying the original terms of the Loan.  A true and correct copy of the Modification is attached hereto as Exhibit C.

96.     Under the Modification, the unpaid principal balance of the Loan was determined to be $274,591, of which $35,441.72 was deferred until the end of the loan term.  The remaining balance was to be repaid over forty years at an interest rate that started at 2% and gradually rose to 4.5%.

97.     The Modification required Ms. Stone to begin making monthly payments of $1280.32, an amount that included principal, interest, taxes and insurance, on September 1, 2011.  The tax and insurance payments were designated to be paid through an escrow.

98.     The Modification provided that "all terms and provisions of the [Countrywide note and deed of trust], except as expressly modified by this Agreement, shall remain in full force and effect . . . and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender

FIRST AMENDED CLASS ACTION COMPLAINT

1   and I will be bound by and will comply with all of the terms and conditions of the
2   [Countrywide note and deed of trust]."  Exhibit C at ¶ 4F.

3   99.   The Modification requires the Borrower to, "…comply, except to the
4   extent that they are modified by this Agreement, with all covenants, agreements and
5   requirements of the [Countrywide note and deed of trust], including my agreement
6   to make all payments of taxes, insurance premiums, assessments, Escrow items,
7   impounds and all other payments, the amount of which may change periodically
8   over the term of my Loan."  Exhibit C, at ¶ 4C.

9   100.   Except for the monthly payment amount, interest rate and principal
10  balance, none of the relevant contractual requirements set forth in the Countrywide
11  note and deed of trust were changed or amended by the Modification.

12  101.   Beginning in September 2011, and thereafter, Ms. Stone began making
13  the required monthly payments under the Modification.

14  102.   In June 2012, servicing rights for Ms. Stone's loan were transferred to
15  Ocwen.  A true and correct copy of Ocwen's Notice of Servicing Transfer is
16  attached as Exhibit D.

17  103.   Ocwen is responsible for servicing Ms. Stone's mortgage loan as it
18  existed at the time it acquired the servicing rights, that is to say, as modified by the
19  August 2011 loan modification.  Ocwen itself recognized the obligation to honor
20  the modification agreement at the time of the servicing transfer.  In a letter attached
21  as Exhibit E, Ocwen identified the $35,441.72 in deferred principal balance that
22  was part of the loan modification.

23  104.   Following Ocwen's commencement of servicing of the Loan, Ms.
24  Stone continued to make timely payments in accordance with the Modification at
25  $1280.32 per month.

26  105.   Nevertheless, based on its own misapplication of Ms. Stone's
27  payments, Ocwen began sending communications indicating that she was in default
28  and assessing her late fees.  Ocwen first assessed Ms. Stone a late fee of $36.21 in

21

FIRST AMENDED CLASS ACTION COMPLAINT

1   November 2012.  Over the course of the next fifteen months, Ocwen assessed at

2   least 11 monthly late fees to Ms. Stone's account, despite her continued timely

3   payments.

4        106.   Ms. Stone was later told by an Ocwen representative that the source of

5   her original default despite her timely payments was a seven-dollar increase in her

6   escrow obligation, about which she had not been informed at the time of its original

7   imposition.  Because Ms. Stone continued to send in monthly payments of

8   $1280.32 as per her modification (rather than a payment that would have been $7

9   higher), Ocwen began to treat her as if she was in default.

10       107.   Once she was deemed in default, Ms. Stone was subjected to a

11  cascading parade of unexplained fees and charges, as well as an endless series of

12  confusing and contradictory written and oral communications from Ocwen.

13       108.   In January 2013, Ocwen sent Ms. Stone a "friendly reminder" letter

14  alleging that she had missed a payment that month, even though she made the

15  payment.

16       109.   In or about May 2013, consistent with prior acceleration of the loan,

17  Ocwen sent Ms. Stone a Notice of Default and began the foreclosure process.   In

18  August 2013, Ocwen began returning Ms. Stone's payments, indicating that the

19  acceleration option of the Note had been invoked.  On information and belief,

20  Ocwen accelerated the loan for the purpose of foreclosure under California law on

21  or about May 2013.  The actual date of acceleration is maintained in Ocwen's

22  account records and/or in its loan servicing notes.

23       110.   Even after acceleration – and before Ms. Stone's reinstatement

24  (described below) – Ocwen continued to assess late fees to Ms. Stone's account, in

25  violation of the note and the deed of trust.  For example, an Ocwen account history

26  sent to Ms. Stone on March 27, 2014 reflects late fees assessed to Ms. Stone's

27  account on May 13, 2013, June 1, 2013, August 1, 2013, September 1, 2013,

28  October 1, 2013, February 1, 2014, and March 1, 2014.  A true and correct copy of

22

Ocwen's March 27, 2014 account history is attached as Exhibit F.  Throughout this time period, Ms. Stone was tendering Ocwen timely monthly payments, some of which Ocwen returned.

111.   In addition, in or about May 2013, Ocwen began assessing Ms. Stone a series of unexplained default-related fees, including dozens of "property inspection" fees, "property maintenance" fees, "trustee fees" and other miscellaneous, unexplained fees.  By way of example, Ms. Stone's August 2014 mortgage statements indicate that Ocwen used a portion of her monthly payment to reimburse itself for 15 separate  "property inspections." For the reasons discussed below, these property inspection fees were not legitimately due and owing and are inflated.  True and correct copies of Ocwen's August 2014 mortgage statements are attached as Exhibit G.

112.   The property inspections at issue, if any, were performed on behalf of Ocwen by Defendant Altisource and billed to Ms. Stone's account.  Ocwen used payments made by Ms. Stone to cover principal and interest in order to reimburse itself for the property inspections thus throwing Ms. Stone's account further out of whack.

113.   Some or all of the inspections were bogus, in that they could not have been more than drive-by inspections for which Ocwen is not allowed, by virtue of various servicing regulations, to bill the account.  One of the inspection reports identifies Ms. Stone's residence as within a "gated community" which it is not. Moreover, Ms. Stone's condominium is on the 4th floor of a building such that no inspection of the property could have yielded information about whether Ms. Stone continued to live in the residence and/or whether she was maintaining it in proper condition. Finally each inspection reached different conclusions about the status of the property, such as whether the property was occupied or whether it contained Ms. Stone's personal property, because the inspector did not have access to the property to view or assess it in any meaningful way.  Nothing was done to reconcile

23

the inconsistent reports, suggesting that they were performed in order to generate income for Ocwen and Altisource, rather than to provide a service to the foreclosing mortgage holder.

114.   On information and belief, Ocwen does not have a policy or practice in place to review the inspections performed by Altisource to evaluate whether the services Altisource is performing are reasonable and necessary and serving the purpose of ensuring that Ocwen's and/or the investor's interest in the property is being protected before imposing property inspection fees on borrowers like Ms. Stone.

115.   Altisource's "curbside," or "drive by" inspections performed on Ms. Stone's property were impermissible, *inter alia*, under the relevant Freddie Mac servicing guidelines, which do not permit servicers to charge a fee for curbside inspections, unless a regular property inspection would violate the law or cause personal danger to the inspector. These factors were not present here. As such, Altisource and Ocwen had no basis to charge Ms. Stone for the curbside inspections Altisource performed.

116.   In August 2013, Ocwen began returning Ms. Stone's payments to her. From August 2013 – August 2014, Ms. Stone continued to make monthly mortgage payments to Ocwen and Ocwen continued to return them.

117.   In July 2014, Ocwen sent Ms. Stone a written communication entitled "Reinstatement Quote."  The Reinstatement Quote stated that "[a] reinstatement means you will bring your mortgage current by paying all past due amounts, including amounts that we paid on your behalf (Servicer Advances)."  The Reinstatement Quote thereby purported to encompass all of the late fees, default-related fees and charges for Foreclosure-Related Services assessed up until that point.  It indicated that Ms. Stone would need to pay approximately $19,779 to achieve reinstatement.  The $19,334.61 includes the following fees and charges, among other things: (1) $434.52 in Late Charges, (2) $25.00 for a Returned Check

24

Fee, (3) $215 in Property Inspection Fees, (4) $490 in Property Maintenance Expenses, (5) $300 for a Trustee Fee, and (6) $2.92 for a Statutory Mailing.  A true and correct copy of Ocwen's July 26, 2014 Reinstatement Quote is attached as Exhibit H.

118.   The Property Maintenance Expenses consist of two $155 registration fees Altisource paid to the City of Los Angeles and recouped from Ocwen, which passed them on to Ms. Stone, and two $90 charges for "registration-related services," incurred the years 2013 and 2014. The "registration-related services" Altisource performed and for which it charged the $90 fee were: (1) identifying which municipality had jurisdiction over the Property by checking tax records for incorporation in the City or unincorporated county; (2) verifying whether registration of the Property was required under the City's registration requirements; (3) completing the registration form required by the City; (4) ordering a check or credit card payment for the City Registration costs; and (5) shipping and documenting the registration package to the City. The $90 charge for "registration-related services," is inflated because it is not commensurate with the services performed and would not have been incurred had Ocwen performed the services itself rather than conspire with Altisource to outsource them in order to generate a fee that they could charge Ms. Stone,

119.   At this point, Ms. Stone felt backed into a corner.  She had lived for over a year in constant fear of losing the roof over her head to foreclosure, during which she spent hundreds of hours struggling with Ocwen's conflicting answers, frustratingly opaque communications and constantly shifting written correspondence.

120.   Based on duress, in July 2014, Ms. Stone borrowed $20,000 from a friend and sent it to Ocwen to reinstate her loan, as described in the Reinstatement Quote.

121.   Even after Ms. Stone's reinstatement, Ocwen continued to send

FIRST AMENDED CLASS ACTION COMPLAINT

inflated mortgage statements demanding even more fees and charges in addition to her regular payments.  When Ms. Stone called Ocwen to question these additional fees, she was told that the prior Reinstatement Quote had been in error.  Ocwen representatives told Ms. Stone that they could charge her whatever they deemed appropriate, and she had no choice but to pay it.

122.   It is *per se* unreasonable for the Defendants to act in concert to deliberately inflate the charges for default-related fees and costs in order to profit by passing them through to borrowers' accounts.

123.   These fees are not legitimate under Ms. Stone's Loan Contracts. Instead, Ocwen is attempting to collect these fees from Ms. Stone as a way to generate illegal and improper revenue for Defendants.

124.   The inflated and/or bogus property inspection and property maintenance fees and costs Ocwen is seeking to collect from the Ms. Stone were charged to Ocwen for services performed by the Defendant Altisource.  They represent the fruits of the conspiracy by Ocwen, Altisource and Erbey to manipulate borrowers' accounts in order to charge above-market fees by outsourcing work from Ocwen to other companies that Erbey controlled.

125.   Beginning in mid 2013, Ms. Stone contacted Ocwen regularly by telephone in attempts to obtain answers about her loan account, to understand why Ocwen was not accepting payments, and to resolve the alleged default.  She was ready, willing and able to pay the escrow deficiency, if Ocwen would have accepted that payment without requiring payment of thousands of dollars in delinquency fees and costs, late charges and other unexplained and/or inflated amounts.

126.   Ms. Stone's experience with Ocwen's customer service was frustrating and unproductive; many times when she called she was connected with Ocwen representatives working outside the United States and she could not understand them due to language barriers; one time a representative told Ms. Stone that if she did not send all of the money Ocwen was demanding Ocwen would foreclose.  On

26

1    other occasions, call center employees acknowledged that they did not have access

2    to sufficient information or have sufficient authority to resolve Ms. Stone's issues.

3         127.   Ms. Stone sent pre-suit written notification to Ocwen on at least six

4    occasions that described, in lay terms, the nature of her concerns about Ocwen's

5    overcharges, its efforts to foreclose and its other misconduct, in order to provide

6    Ocwen with an opportunity to correct her account and withdraw the foreclosure.

7    Those written communications were dated December 5 and December 20, 2013,

8    March 7, 2014, and July 15, 17 and 19, 2014.  Despite these written

9    communications and innumerable phone calls, Ocwen made no effort to correct the

10   problems complained of.

11                          **CLASS ACTION ALLEGATIONS**

12        128.   Ms. Stone brings this action on behalf of herself and all persons in the

13   United States ("the Class") whose single-family mortgage loans were serviced by

14   Ocwen and who were assessed late charges after the date on which their loan

15   balance was accelerated, or who incurred or were assessed one or more of the

16   following charges:  1) property inspection or maintenance fees; 2) fees for an

17   appraisal or broker's price opinion; or 3) fees for title search, title review or trustee

18   services.  Ms. Stone also brings these claims on behalf of California residents

19   meeting these same criteria (the "California Subclass").

20        129.   Ms. Stone and the Class seek certification of the Class under Federal

21   Rules of Civil Procedure 23(a) and 23(b)(1), (2), and (3).  In the alternative, Ms.

22   Stone and the Class seek certification of particular issues related to Ocwen's

23   liability for the practices at issue pursuant to Fed. R. Civ. P. 23(c)(4).

24        130.   Excluded from the Class are: (a) the Defendants and any of their

25   corporate parents, subsidiaries, affiliates, partners, officers, directors, predecessors,

26   or successors; (b) any judge or judicial official assigned to this matter and his or her

27   immediate family; and (c) the legal representatives, successors or assigns of any

28   such excluded persons or entities.

131.   The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Ms. Stone at this time, such information can be ascertained through appropriate discovery, from records maintained by Ocwen and its agents.

132.   Common questions of fact and/or law exist as to all members of the Class.  Among the questions of law and/or fact common to the Class are:

a.   Whether the Defendants have engaged in a common course of deceptive, misleading, or unfair conduct, including the acts and practices identified herein in the servicing of loans collateralized by real property and in collecting alleged debts in connection with these loans;

b.   Whether Ocwen engaged in a uniform practice of assessing late fees after acceleration of the loan balance;

c.   Whether Defendants improperly and illegally overcharged class members for default-related fees, inspection fees, appraisals, broker's price opinions, title services and/or trustee charges;

d.   Whether the Defendants engaged in improper debt collection activities in violation of state law;

e.   Whether the Defendants engaged in improper foreclosure activities;

f.   Whether Ocwen systematically misapplied customer payments;

g.   Whether Ocwen breached contracts with customers;

h.   Whether the Defendants have been unjustly enriched;

i.   Whether the Defendants violated the state consumer protection acts, including the laws of California and Florida;

j.   Whether Ms. Stone and the Class members are entitled to the injunctive and equitable relief requested herein, including restitution and rescission of the loan agreements; and

FIRST AMENDED CLASS ACTION COMPLAINT

k.     Whether Ms. Stone and the Class members have sustained damages, and the proper measure of damages.

133.   Plaintiff's claims are based on form loan documents, standardized servicing and debt collection practices, form letters, and accounting standards that were used or implemented by the Defendants on a nationwide basis.

134.   Defendants and their principals participated in, controlled and implemented the challenged practices on a uniform basis from their central offices.

135.   There are no substantial individual questions among the class claims, other than the amount of relief each Class member is entitled to receive.  Common questions thus predominate.

136.   Ms. Stone's claims are typical of the claims of the members of the Class, as Ms. Stone and all other Class members sustained harm arising out of the Defendants' common course of wrongful conduct.

137.   Ms. Stone will fairly and adequately represent and protect the interests of the members of the Class, and Ms. Stone has retained counsel competent and experienced in class action, unfair mortgage lending, mortgage loan servicing, and consumer fraud litigation.

138.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the Defendants within the meaning of Rule 23(b)(1)(A).

139.   The Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole within the meaning of Rule 23(b)(2).

140.   Questions of law or fact common to the members of the Class predominate over any questions affecting only individual members within the meaning of Rule 23(b)(3).

FIRST AMENDED CLASS ACTION COMPLAINT

141.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, most members of the Class would likely find the cost of adjudicating their claims to be prohibitive, and would have no effective remedy at law.  Separate individual actions would be inefficient from the standpoint of the judicial system.

142.   The California Subclass repeats and realleges the aforesaid class action allegations and each meets the criteria for certification in Rule 23.

143.   To the extent that the Court rules that any class claim cannot be decided except under the laws of a particular state, the proposed class and subclass can further be divided into state-based subclasses for the purposes of that class claim and each resulting state-based subclass also meets the criteria for certification in Rule 23.

144.   Plaintiffs believe that notice to the Class is necessary and propose that notice of this class action be provided by individual mailings to Class members and/or by publication in national publications.

## TOLLING OF STATUTES OF LIMITATIONS BY FRAUDULENT CONCEALMENT

145.   Any applicable statutes of limitations have been tolled by the Defendants' continuing, knowing, and active concealment of the facts alleged herein.  Despite exercising reasonable diligence, Ms. Stone could not have discovered, did not discover, and was prevented from discovering, the wrongdoing complained of herein.

146.   In the alternative, the Defendants should be estopped from relying on any statutes of limitations.  The Defendants have been under a continuing duty to disclose the true character, nature, and quality of their financial services and debt collection practices.  The Defendants owed Ms. Stone and the Class an affirmative duty of full and fair disclosure, but knowingly failed to honor and discharge such duty.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Fraudulent Concealment)

### (By Ms. Stone on Behalf of Herself and

### the Class as Against All Defendants)

147.   Ms. Stone and the Class hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

148.   The Ocwen Defendants concealed material facts known to them but not to Ms. Stone and the Class, including, without limitation, the absence of records supporting the amounts claimed due for improper late fees, default-related fees and charges for Foreclosure-Related Services.

149.   All Defendants concealed material facts known to them but not to the Ms. Stone and the Class about the business relationships among them and that those business relationships caused them to incur above-market rate prices for default and Foreclosure-Related Services.

150.   The Defendants' fraudulent concealment constitutes, in effect, misrepresentations of the actual amount due on which the Defendants intended that Plaintiff and each Class member rely.  Ms. Stone and the Class did justifiably rely on the accuracy of Ocwen's representations of the amounts claimed due.

151.   Ms. Stone and the Class were damaged as a result of the Defendants' fraudulent concealment.

## SECOND CAUSE OF ACTION

### (Unjust Enrichment)

### (By Ms. Stone on Behalf of Herself

### and the Class as Against All Defendants)

152.   Ms. Stone and the Class hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

FIRST AMENDED CLASS ACTION COMPLAINT

153.   By their wrongful acts and omissions, including but not limited to the imposition of improper late fees, default-related fees and charges for Foreclosure-Related Services, the Defendants have been unjustly enriched at the expense of Ms. Stone and the Class, and thus Ms. Stone and the Class have been unjustly deprived.

154.   Ms. Stone and the Class: (a) conferred a benefit on Defendants, which had knowledge of the benefit; (b) Defendants voluntarily accepted and retained the benefit; and (c) under the circumstances it would be inequitable for Defendants to retain the benefit without paying for it.

155.   Ms. Stone and the Class do not have an adequate remedy at law.

156.   By reason of the foregoing, Ms. Stone and the Class seek restitution from Defendants, and an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## THIRD CAUSE OF ACTION

### (Breach of Loan Contracts)

### (By Ms. Stone on Behalf of Herself

### and the Class as Against the Ocwen Defendants)

157.   Ms. Stone and the Class hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

158.   Ocwen assumed the obligations of the Loan Contracts of Ms. Stone and those of the Class when it took over the servicing of their loans.

159.   Ocwen is in privity with Ms. Stone and the Class.

160.   By charging late fees after acceleration, Ocwen breached Loan Contracts with Ms. Stone and the Class.  The Loan Contracts provide for a late fee when a "monthly payment" or "installment" is paid after its due date.  After acceleration of the loan balance the entire loan balance is due. Thereafter, borrower payments in any amount are no longer considered "monthly" or "installment" payments as a matter of contract and applicable law.  There is no ongoing due date for partial payments of the loan.  Absent a late monthly payment or installment,

32

there is no legal or contractual basis under the Loan Contracts for a servicer to impose a late charge.

161.   By assessing default-related fees and charges for Foreclosure-Related Services in amounts that were neither reasonable nor necessary, Ocwen breached Loan Contracts with Ms. Stone and the Class.

162.   Ocwen's breaches of contract are in violation of the common law of every state in which Ocwen does business.

163.   As a result of Ocwen's wrongful conduct, Ms. Stone and the Class have suffered and continue to suffer damages in an amount to be determined according to proof at time of trial, including attorney's fees and reasonable costs.

## FOURTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing)

### (By Ms. Stone on Behalf of Herself and

### the Class as Against the Ocwen Defendants)

164.   Ms. Stone and the Class hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

165.   The subject Loan Contracts between Ms. Stone and the Class on one hand, and Ocwen on the other, included a duty of good faith and fair dealing. Pursuant to an implied covenant in the subject Loan Contracts, Ocwen had a duty not to do anything that would deprive Ms. Stone and the Class of the benefits of those contracts, and had a duty to do everything that the contracts presupposed each of the parties would do to accomplish the purpose or purposes of the subject contracts.

166.   The Ocwen Defendants acted in breach of the implied covenant of good faith and fair dealing, and their duties thereunder by assessing improper late fees, default-related fees and charges for Foreclosure-Related Services.

FIRST AMENDED CLASS ACTION COMPLAINT

167.   Ocwen's breaches of the covenant of good faith and fair dealing are in violation of the common law of contract in every state in which Ocwen does business.

168.   As a result of Ocwen's wrongful conduct, Ms. Stone and the Class have suffered and continue to suffer economic losses and other damages.

## FIFTH CAUSE OF ACTION

### (Declaratory and Injunctive Relief)

### (By Ms. Stone on Behalf of Herself

### and the Class as Against All Defendants)

169.   Ms. Stone and the Class hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

170.   Pursuant to 28 U.S.C. § 2201 this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  Under 28 U.S.C. § 2202 the Court may award "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

171.   Ms. Stone and the Class are in doubt as to their rights vis-à-vis their Loan Contracts and Defendants' responsibilities to service them fairly and lawfully.

172.   As set forth above, common law and federal statutes create duties for Defendants that they owe to Ms. Stone and the Class and they create legal rights for Ms. Stone and the Class.

173.    There is a bona fide, actual, present, practical need for the Court to declare these rights.  There is an on-going dispute that has given rise to and will in the future give rise to injury to Ms. Stone and the Class.

174.   As set forth above, Ms. Stone individually and on behalf of other Class members alleges that Defendants have violated the foregoing common law and statutory duties they owe to her and Class members, injured her and Class members

34

thereby, and violated one or more cognizable legal rights she and Class members possess by assessing improper late fees, default-related fees and charges for Foreclosure-Related Services. Defendants' violations of these rights are on going. On each cause of action stated above, Ms. Stone and the Class will be irreparably injured in the future by the Defendants' misconduct.

175.   Ms. Stone and the Class seek a judgment declaring that the Defendants must cease the activities described herein, and provide adequate procedures and policies for the immediate and complete refund of the improper charges and unlawfully assessed and/or for correction of borrower accounts.

176.   Ms. Stone and the Class do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and will suffer irreparable injury as a result of the Defendants' misconduct unless injunctive and declaratory relief is granted.

177.   Ms. Stone and the Class also seek declaratory relief pursuant to state law, to the extent allowed, to determine whether Defendants' conduct as described herein violates the Loan Contracts and/or other applicable law.  They further seek such relief to determine their legal obligation to repay sums at issue that remain posted to their Ocwen accounts.  Ocwen has refused and continues to refuse to act to address the legitimacy of the challenged assessments to Ms. Stone's account.

178.   By reason of the foregoing, Ms. Stone and the Class are entitled to a federal or state law declaratory judgment and/or to injunctive relief as set forth herein, together with incidental monetary relief attendant to the declaration of their rights and/or the injunction.

///

///

///

///

FIRST AMENDED CLASS ACTION COMPLAINT

## SIXTH CAUSE OF ACTION

**(Violation of the Florida Deceptive and Unfair Trade Practices Act)**

**(Brought By Ms. Stone on Behalf of Herself and the Class, As Against All Defendants)**

**(Ch. 501, Par II, Fla. Stat)**

179.   Ms. Stone and the Class hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

180.   Ms. Stone brings this cause of action on behalf of herself and the Class because the Defendants are based in Florida and because the conduct at issue either occurred in Florida by virtue of the centralized business practices of Defendants or was based in policies and procedures that originated from Defendants' home offices in Florida

181.   This is an action for actual damages and injunctive relief or declaratory relief pursuant to Chapter 501, Part II, Fla. Stat., the "Florida Deceptive and Unfair Trade Practices Act" ("FDUTPA").

182.   Ocwen's acts and practices described herein, including the imposition of improper late fees, default-related fees and charges for Foreclosure-Related Services, originated from its center of business operations in the State of Florida. Ocwen is in violation of the statutes of State of Florida, and/or the state consumer protection law in every state in which Ocwen does business.

183.   The conspiracy alleged in this Complaint originated in Florida, but affects consumers in all fifty states.  The systems used to record and account for the illegal practices complained of were maintained in Florida and substantial evidence concerning the acts alleged is maintained in that state.

184.   At all times material hereto, Ms. Stone and the Class were "consumers" within the meaning of FDUTPA, and Defendants have engaged in "trade or commerce" within the meaning of FDUTPA.

FIRST AMENDED CLASS ACTION COMPLAINT

185.   Section 501.204(1) of FDUTPA imposes a duty on Defendants to refrain from engaging in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

186.   Section 501.211 of FDUTPA provides consumers with a private right of action for FDUTPA violations.

187.   Based on the foregoing course of conduct alleged throughout this Complaint, including the imposition of improper late fees, default-related fees and charges for Foreclosure-Related Services, Defendants have engaged in representations, acts, practices or omissions that are material and that are likely to mislead consumers acting reasonably under the circumstances.  Thus, Defendants have engaged in deceptive acts or practices in violation of § 501.204(1), *Fla. Stat.*

188.   Moreover, based on the foregoing course of conduct alleged throughout this Complaint, Defendants have committed acts or practices in trade or commerce that offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers; or Defendants have committed acts or practices which have caused, or are likely to cause, consumer injury, which is substantial, not outweighed by any countervailing benefits to consumers or competition that the practice produces, and an injury that consumers themselves could not reasonably have avoided.  Therefore, Defendants have engaged in unfair acts or practices in violation of § 501.204(1), Fla. Stat.

189.   As set forth above throughout the Complaint, consumers, including Ms. Stone and the Class, have suffered losses and been aggrieved and thus incurred actual damages or are entitled to injunctive relief and/or declaratory relief as a result of Defendants' unfair or deceptive acts or practices in violation of FDUTPA, in an amount or extent to be determined at trial.

///

FIRST AMENDED CLASS ACTION COMPLAINT

**SEVENTH CAUSE OF ACTION**

**(California Business and Professions Code section 17200, *et seq.*)**

**(By Ms. Stone on Behalf of Herself and the California Subclass as Against All Defendants)**

190.   Ms. Stone and the Class hereby incorporate the facts alleged in all preceding and subsequent paragraphs.

191.   Ms. Stone brings this cause of action on behalf of herself and the members of the California Subclass.

192.   California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practice."  For the reasons described above, Ocwen has engaged in unfair or fraudulent business acts or practices in violation of California Business and Professions Code sections 17200, *et seq.*

193.   In the course and conduct of their loan servicing and collection, including the imposition of improper late fees, default-related fees and charges for Foreclosure-Related Services, Ocwen knowingly, affirmatively, and actively concealed the true character, quality, and nature of its assessment of marked-up default-related service fees against borrowers' accounts.  Relying on Ocwen, Ms. Stone, and members of the California Subclass believe they are obligated to pay the amounts specified in Ocwen's communications.

194.   In truth and in fact, borrowers are not obligated to pay the amounts that have been specified in Ocwen's communications concerning default-related services, including property inspections, BPOs, trustee fees, foreclosure services and title searches.  Ocwen disguises the fact that the amounts they represent as being owed have been marked-up beyond the actual cost of the services, violating the disclosures in the mortgage contract.  Contrary to Ocwen's communications, it is not legally authorized to assess and collect these marked-up fees.

195.   Ocwen's knowing, affirmative, and active concealment, as set forth herein, constitutes an unlawful practice because it violates Title 18 United States

FIRST AMENDED CLASS ACTION COMPLAINT

Code sections 1341, 1343, and 1962, as well as California Civil Code sections 1572, 1573, 1709, 1710, and 1711, California's Rosenthal Fair Debt Collection Practices Act, and the common law.

196.   Ocwen's practice of misapplying borrowers' payments, thereby breaching borrowers' Loan Contracts, also constitutes an unlawful practice in violation of California Business and Professions Code sections 17200, *et seq.*

197.   Ocwen's knowing, affirmative, and active concealment, as set forth herein, also constitutes unfair business acts and practices within the meaning of California Business and Professions Code sections 17200, *et seq.*, in that Ocwen's conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous.  Ms. Stone also asserts a violation of public policy by concealing material facts from consumers.  Ocwen's violation of California's consumer protection and unfair competition laws in California resulted in harm to consumers.

198.   There were reasonable alternatives available to Ocwen to further its legitimate business interests, other than the conduct described herein.

199.   California Business and Professions Code section 17200, *et seq.* also prohibits any "fraudulent business act or practice."  Ocwen's concealment of material facts, as set forth above, was false, misleading, or likely to deceive the public within the meaning of California Business and Professions Code section 17200, *et seq.*  Ocwen's concealment was made with knowledge of its effect, and was done to induce Ms. Stone and members of the California Subclass to pay the marked-up default related service fees.

200.   Ms. Stone and members of the California Subclass relied on their reasonable expectation that Ocwen would comply with the disclosures set forth in the mortgage agreement, Notes, and Deeds of Trust, and as a result, Ms. Stone and members of the California Subclass relied on Ocwen's disclosures about the fees on their statements, reasonably believing the default-related service fees to be valid charges that were not marked-up. Indeed, to lull borrowers into a sense of trust and

1   dissuade them from challenging Ocwen's unlawful fee assessment, Ocwen

2   concealed its scheme from borrowers by telling them, in statements and other

3   documents, that such fees are in accordance with the terms of their mortgage.  Had

4   the true nature of the fees been disclosed to Ms. Stone and the members of the

5   California Subclass, they would have been aware of the mark-ups and disputed the

6   charges and not paid them.

7       201.   Ms. Stone and the members of the California Subclass have been

8   injured in fact and suffered a loss of money or property as a result of Ocwen's

9   fraudulent, unlawful, and unfair business practices.  Ms. Stone and the members of

10  the California Subclass would not have paid Ocwen's unlawful fees or they would

11  have challenged the assessment of such fees on their accounts had it not been for

12  Ocwen's concealment of material facts.

13      202.   Ocwen has thus engaged in unlawful, unfair, and fraudulent business

14  acts entitling Ms. Stone and the members of the California Subclass to judgment

15  and equitable relief against Ocwen, as set forth in the Prayer for Relief.

16      203.   Additionally, under Business and Professions Code section 17203, Ms.

17  Stone and members of the California Subclass seek an order requiring Ocwen to

18  immediately cease such acts of unlawful, unfair, and fraudulent business practices,

19  and requiring Ocwen to correct its actions.

20              **EIGHTH CAUSE OF ACTION**

21      **(ROSENTHAL FAIR DEBT COLLECTION PRACTICES ACT,**

22          **CALIFORNIA CIVIL CODE §§ 1788, *ET SEQ.*)**

23  **(By Ms. Stone on Behalf of Herself and the California Subclass as Against All**

24                  **Defendants)**

25      204.   Ms. Stone and the Class hereby incorporate the facts alleged in all

26  preceding and subsequent paragraphs.

27      205.   Ms. Stone brings this cause of action on behalf of herself and the

28  members of the California Subclass.

FIRST AMENDED CLASS ACTION COMPLAINT

206.   As alleged herein, and as set forth in detail above, Defendants have committed violations of the Rosenthal Fair Debt Collection Practices Act, California Civil Code section 1788, *et seq.* ("RFDCPA" or "Rosenthal Act").

207.   California's Rosenthal Act was enacted "to prohibit debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts and to require debtors to act fairly in entering into and honoring such debts . . . ." Cal. Civ. Code § 1788.1.

208.   The Rosenthal Act defines the term "debt collector" as "any person who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection."  Cal. Civ. Code § 1788.2(c).  "Debt" is defined as "money, property or their equivalent which is due or owing or alleged to be due from a natural person to another person."  Cal. Civ. Code § 1788.2(d).

209.   Ocwen is a "debt collector" within the meaning of California Civil Code section 1788.2(c), because Defendants sent mortgage bills to Plaintiff and members of the California Subclass, Plaintiff and members of the California Subclass made their mortgage payments to Defendants, Defendants accepted those payments, and Defendants made demands for payment, including the payment of marked-up fees for default-related services, by sending letters, making telephone calls, and other attempts to collect mortgage payments and fees.

210.   The marked-up fees for default-related services purportedly owed by Plaintiff and members of the California Subclass are a "debt" within the meaning of California Civil Code section 1788.2(d) because they are "money, property or their equivalent which [are] due or owing or alleged to be due or owing from a natural person to another person."

211.   The RFDCPA prohibits a debt collector from using any false, deceptive, or misleading representation or means in connection with the collection of any debt.

FIRST AMENDED CLASS ACTION COMPLAINT

212.   Defendants knowingly, affirmatively, and actively concealed and suppressed material facts, namely the fact that Defendants assessed borrowers' accounts for improper late fees, default-related fees and charges for Foreclosure-Related Services.  Contrary to Ocwen's communications, it is not legally authorized to assess and collect these marked-up fees.

213.   Ms. Stone and the California Subclass suffered damages as a result of these acts.

214.   Pursuant to California Civil Code sections 1788.17 and 1788.30, Plaintiff and members of the California Subclass are entitled to recover actual damages sustained as a result of Defendants' violations of the RFDCPA.  Such damages include, without limitation, monetary losses and damages.  Additionally, because Defendants' violations of the RFDCPA were committed willingly and knowingly, Plaintiff and members of the California Subclass are entitled to recover penalties of up to $1,000 per violation as provided for in the RFDCPA.

215.   Pursuant to California Civil Code sections 1788.17 and 1788.30, Plaintiff and the California Subclass are entitled to recover attorneys' fees, costs and expenses incurred in the bringing of this action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Ms. Stone, on behalf of herself and all members of the Class and the California Subclass, requests judgment and relief as follows:

1.      Certification of the case as a class action on behalf of the proposed Class, and designation of Ms. Stone as representative of the Class, and her counsel of record as Class Counsel;

2.      Certification of the case as a class action on behalf of the proposed Subclass, and designation of Ms. Stone as Subclass representative, as applicable, and her counsel of record as Subclass Counsel;

3.      Award restitution and disgorgement according to proof;

4.      Order Ocwen to perform an accounting;

42

5. Order declaratory and injunctive relief against Defendants to prevent future wrongful conduct together with monetary relief incidental thereto;

6. Award actual, statutory, exemplary and/or punitive damages according to proof;

7. Award prejudgment interest at the maximum legal rate;

8. Award costs of the proceedings herein;

9. Award reasonable attorneys' fees; and

10. All such other and further relief as the Court deems just and proper.

Dated:  June 3, 2015

**Respectfully Submitted:**

/s/GretchenCarpenter
Gretchen Carpenter (State Bar No. 180525)
**Strange & Carpenter**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA  90025
Phone:  (310) 207-5055
Fax:  (310) 826-3210
Email:  gcarpenter@strangeandcarpenter.com

Gary E. Klein (admitted *pro hac vice*)
Shennan Kavanagh (admitted *pro hac vice*)
Kevin Costello (admitted *pro hac vice*)
**Klein Kavanagh Costello, LLP**
85 Merrimac Street
Boston, MA 02114
Phone: (617) 357-5500
Email: klein@kkcllp.com
Email: costello@kkcllp.com
Email: kavanagh@kkcllp.com

43

1

## **JURY DEMAND**

Ms. Stone hereby requests trial by jury as to all issues so triable.

Dated:  June 3, 2015

**Respectfully Submitted:**

/s/GretchenCarpenter
Gretchen Carpenter (State Bar No. 180525)
**Strange & Carpenter**
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA  90025
Phone:  (310) 207-5055
Fax:  (310) 826-3210
Email:  gcarpenter@strangeandcarpenter.com

Gary E. Klein (admitted *pro hac vice*)
Shennan Kavanagh (admitted *pro hac vice*)
Kevin Costello (admitted *pro hac vice*)
**Klein Kavanagh Costello, LLP**
85 Merrimac Street
Boston, MA 02114
Phone: (617) 357-5500
Email: klein@kkcllp.com
Email: costello@kkcllp.com
Email: kavanagh@kkcllp.com

FIRST AMENDED CLASS ACTION COMPLAINT